IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM GIBSON,
        Plaintiff
    v.
BLAIR COUNTY, et al.,
        Defendants

Case No. 3:10-cv-327-KRG-KAP

## Report and Recommendation

### Recommendation

Defendants' motions for summary judgment, docket no. 22, docket no. 25, should be granted.

### Report

Plaintiff William Gibson, proceeding pro se after counsel was permitted to withdraw, alleged in the amended complaint, docket no. 2, that he was an inmate in the Blair County Prison on December 27, 2008, and received delayed and insufficient medical treatment in the wake of an attack on him by another inmate. Gibson alleged that he suffered injury to his left eye as a result.

The assault itself is not alleged to be the basis for any defendant's liability. Gibson alleges he was placed in "lock down" for several hours immediately following the assault; after an unnamed nurse looked at him on December 28, 2008, Gibson was sent to the Altoona Hospital for treatment. Whether directly as a result of this episode or due to independent events, Gibson alleges that the condition of his left eye continued to require medical attention between the end of December 2008 and early March 2009, when Gibson was transferred to the state prison system, and in the weeks before his transfer, Gibson alleges, he was diagnosed with

scleritis of his left eye. Gibson's theory of liability becomes ambiguous here: the complaint tries to allege both that the lack of treatment for the assault led to scleritis and that the scleritis was an independent event that would have been detected if adequate care for the assault had been provided. However Gibson intended it, it is allegedly due to inadequate care by the Blair County Prison medical and correctional staff that Gibson lost sight in his left eye: at some point after his transfer to the state prison system, Gibson had his left eye surgically removed.

Defendants "Nurse Lisa" and "Nurse Melissa" were allegedly liable (under state law for negligence and under federal law for deliberate indifference to an inmate's serious medical needs) for not providing medical attention on December 28, 2008, (the date in Complaint at ¶13, is December 28, 2010, but I presume that is a typo) or for several weeks afterward, Complaint at ¶18; defendant PrimeCare Medical, Inc., is allegedly liable for Nurse Lisa and Nurse Melissa's negligence on a theory of <u>respondeat superior</u>. Defendants Johnston, the warden, and Mazuky, the deputy warden, are allegedly liable (under federal law for deliberate indifference to an inmate's serious medical needs) because Gibson sought medical attention from them as well and they "often," Complaint at ¶19, neglected or refused to provide it. Blair County is allegedly liable for the actions of Johnson and Mazuky because it (or its policy maker, Johnston) had a custom or policy of

2

inadequately assessing the medical condition of detainees after altercations, and of providing inadequate medical care to inmates generally.

At the end of the discovery period, defendants filed motions for summary judgment, docket no. 22, docket no. 25, supported by briefs and a statement of material facts with exhibits in support, docket no. 23. Plaintiff has not replied to the defendants' motions, despite notice that failure to respond would not prevent adjudication of the motions, docket no. 37.

In <u>Poulis v. State Farm Fire and Casualty Co.</u>, 747 F.2d 863, 868 (3d Cir.1984), the Third Circuit set forth six factors to be weighed in considering whether dismissal of a case as a sanction for failure to prosecute was proper: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.

After the withdrawal of counsel, plaintiff is proceeding <u>pro se</u> and bears all of the responsibility for his failure to file a response. Plaintiff's conduct cannot on this record be described as willful, and there is no history of dilatory conduct. While

defendants are not legally prejudiced by an inert piece of civil litigation, they do suffer a nontrivial financial loss from the expense of defending a lawsuit. Most importantly, although the complaint states some colorable claims, there is not a shred of evidence that any defendant caused plaintiff harm or is legally liable to plaintiff. Dismissal as a sanction would be appropriate; for an indigent incarcerated party it is hard to imagine any other sanction that would be meaningful. I would recommend dismissal for lack of prosecution even if the grant of summary judgment were not also appropriate.

A federal claim of deliberate indifference to a serious medical need requires evidence that defendant medical care providers are subjectively aware of the inadequacy of their care:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official **knows of and disregards** an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, **and he must also draw the inference.**

Farmer v. Brennan, 511 U.S. 825, 837 (1994)(my emphasis). This requires evidence not only of (1) substandard care resulting in an injury to Gibson, but also (2) that defendants chose their actions knowing that their efforts were inadequate.

As for the state law claim of negligence, plaintiff must produce evidence to show (1) the standard of care and a breach thereof, that is, what was medically necessary to treat Gibson's

4

condition that the named defendants did not provide and (2) causation and injury, that is, what harm did Gibson suffer as a result of any named defendant's conduct in failing to provide that necessary treatment. To eliminate claims that cannot be supported by evidence of a breach of the standard of care at the earliest stage, Pennsylvania law requires a certificate of merit by a professional in the relevant specialty, Pa.R.Civ.P. 1042.3(a)(1), to proceed with any negligence claim. Gibson's failure to provide a certificate of merit despite notice, see docket no. 10, requires dismissal of his negligence claims against all the medical defendants, and of his derivative respondeat superior claim against PrimeCare. See Velazquez v. UPMC Bedford Memorial Hospital, 328 F.Supp.2d 549 (W.D.Pa.2004).

Even if provision of an expert's certificate of merit were not a requirement of Pennsylvania's substantive negligence law, to prove either a negligence claim or a deliberate indifference claim, Gibson would have to provide medical expert evidence to prove the standard of care, a breach thereof, and causation. Expert testimony is required in negligence cases unless a "matter ... is so simple ... as to be within the range of ordinary experience and comprehension of even nonprofessional persons." See Brannan v. Lankanau Hospital, 417 A.2d 196, 201 (Pa.1980), quoting Chandler v. Cook, 265 A.2d 794, 796 (Pa.1970). See also Festa v. Greenberg, 511 A.2d 1371, 1376 (Pa.Super.1986)

5

alloc. denied, 527 A.2d 541 (Pa.1987) (expert testimony needed in informed consent cases to establish the existence of medical risks about which the average juror has no knowledge); Toogood v. Rogal, 824 A.2d 1140, 1145 and 1149 (Pa.2003); compare Bushman v. Halm, 798 F.2d 651, 658-59 (3d Cir.1986)(expert testimony not necessary in a motor vehicle collision to prove causation of trauma); see also Geibel v. United States, 667 F. Supp. 215, 219 (W.D.Pa.1987)(discussing lack of expert evidence submitted to prove claim that dosage decision by physician caused plaintiff harm), aff'd, 845 F.2d 1011 (3d Cir.1988). It should go without saying that the same rule applies in a deliberate indifference case, see Boring v. Kozakiewicz, 833 F.2d 468, 473 (3d Cir.1987)(expert testimony required to prove that a medical need was serious), cert. denied, 485 U.S. 991 (1988).

Motion for summary judgment by Blair County, Warden Johnston and Deputy Warden Mazuky, docket no. 25.

Gibson provides no expert evidence in support of his claim of denial of medical care or inadequate medical care. But these defendants are entitled to summary judgment, even if there were such evidence. In the absence of truly unusual circumstances, corrections personnel who leave the medical care of inmates to the medical personnel employed by a prison are not deliberately indifferent because they do not have the requisite subjective state of mind for liability. Spruill v. Gillis, 372 F.3d 218, 236 (3d

Cir.2004). There is no evidence that either the warden or deputy warden interfered with or countermanded medical care to plaintiff, nor is there evidence that Johnston or Mazuky knew that the medical staff was mistreating an inmate and failed to take action.

As for Blair County, a municipality can only be liable for the violation of Gibson's rights by its employees or agents if if it caused the violation, that is, that some individual defendant demonstrated deliberate indifference to plaintiff's serious medical needs, and that was caused by a constitutionally deficient custom or policy attributable to Blair County. Monell v. New York City Dep't of Social Services, 436 U.S. 658, 691 (1978). A policy is an official proclamation or edict, while a custom is a practice that is so persistent and widespread as to practically have the force of law. Connick v. Thompson, 131 S.Ct. 1350, 1358-60 (2011); Wargo v. Schuylkill County, 348 Fed.Appx. 756, 760 (3d Cir.2009). Evidence of prior similar violations of an inmate's rights is one way of meeting this "stringent standard." Li Min v. Morris, 445 Fed. Appx.574, 576 (3d Cir.2011)(quoting Connick v. Thompson). The complaint alleges in conclusory fashion at ¶25 and ¶34 that "upon information and belief" the allegedly insufficient care give to plaintiff was due to "a policy and/or practice" in "similar" cases "in the past." Another way of proving an official policy is to show an express directive from a policy maker. The complaint alleges that an "express policy" of providing inadequate care was

promulgated by defendant Johnson. Complaint at ¶34. Those allegations do not constitute evidence. Because there is no evidence of any custom or policy, much less an unconstitutional one, and no evidence of any other similar case, much less a similar case in which there was deliberate indifference, Blair County's motion for summary judgment must be granted.

Motion for summary judgment by Nurse Lisa, Nurse Melissa, and Primecare Medical, Inc., docket no. 22.

In addition to the barrier posed by the lack of a certificate of merit or expert opinion, Gibson's claims of negligence and deliberate indifference as to Nurse Lisa and Nurse Melissa founder on the lack of evidence. The respondeat superior negligence claim against PrimeCare fails thereby. The duties of each nurse are not spelled out in the complaint or the answer, but as nurses and not ophthalmologists, these defendants would be responsible for failing to refer a matter beyond their ability to treat to an ophthalmologist, or for failing to provide care at the direction of an ophthalmologist, but not for failing to diagnose scleritis or deciding on a course of care for scleritis. In the absence of any evidence that these defendants failed in providing the services within the scope of their professional duties, plaintiff has not produced enough evidence to show that there is a genuine dispute for trial. The same holds true for the deliberate indifference claim asserted against these defendants.

8

The treatment records provided by the medical defendants, docket no. 23, show that Gibson was seen regularly by medical personnel for a variety of complaints from the time he first arrived at the Blair County Prison in April 2008. docket no. 23, Exhibit B. After the assault on December 27, 2008, he was seen by Dr. Capriotti (his name, and other words, are variously misspelled throughout the record; I have generally corrected the errors I spotted), an ophthalmologist, in the emergency room at the Altoona Hospital on December 28, 2008, about 24 hours after the attack. The primary treating physician was Dr. Linnane Batzel. A CT scan taken during this visit and interpreted by Dr. Bharath Chinta indicated "mild left periorbital soft tissue swelling" but no broken bones. Exhibit A at 25-26. RN Shawna Koehle diagnosed Gibson as having a swollen left eye with bloody discharge, or a "subconjunctival hemorrhage in left eye" and "conjunctiva edematous in left eye, significant L periorbital edema and ecchymoses," and noted that Dr. Capriotti would be seeing Gibson. Exhibit A at 10. Dr. Capriotti examined Gibson and directed that Gibson be seen in his private office the next day. Exhibit A at 4. The nursing notes indicate that at the time he was discharged, Gibson received a prescription from Dr. Capriotti for eye drops, and instructions to take Ultram or ibuprofen for pain relief, and instructions to ice the areas of injury. Exhibit A at 17-18. Medication records

indicate that Gibson received the eye drops as directed. Exhibit B at 46-47.

Gibson had the follow-up appointment on December 30, 2008, Exhibit B at 28, and on December 31, 2008, Exhibit B at 25, at Dr. Capriotti's office. Dr. Capriotti's notes explain that he could find no pathology to explain Gibsons's claim of blindness in the left eye, but that he was concerned about optic nerve damage. Dr. Capriotti therefore referred Gibson to a neurological ophthalmologist in Pittsburgh, Dr. Hazem Samy, for an appointment. Exhibit B at 25. Dr. Samy's January 5, 2009 office notes, Exhibit C at 3-4, report his impression and plan of treatment:

-I don't see any signs of traumatic optic neuropathy and he has healthy optic nerve and retina in his left eye
-The CT scan did not show any optic canal fracture or any orbital pathology
-his subjective complaint today of visual acuity no light perception with his left eye isn't supported by the clinical exam without APD and with 20/60 Vision in his left eye as tested by the vectograph
-Mr. Gibson has ecchymosis and subconjunctival [hemorrhage] in the left eye from the trauma as he was given neurontin 300 mg TID for 5 days
-he needs repeated dilated fundus exam in 2-3 weeks to confirm flat retina and to [rule out] any peripheral retinal tear th[at] could be missed as he still has swollen eye and pain during exam that limit the exam of the far peripheral retina.

Dr. Capriotti's notes dated January 9, 2009, indicate that Gibson's left eye subconjunctival hemorrhage was "resolving", and that there was "No evidence of intraocular damage", and although the patient "denies vision," "we cannot find any pathology [in the left eye]." Exhibit B at 19.

On January 22, 2009, Gibson attended a follow-up appointment with Dr. Samy and Dr. Denise Gallagher, who wrote:

Impression:
1) [status post] blunt trauma [left eye approximately] 2 weeks ago. No evidence of intraocular or optic nerve damage or inflammation. Exam is not consistent with patient's claim of no light perception vision for left eye: Patient objects to bright lights being shined in the left eye, pupils are both equal and reactive, no sign of afferent pupillar defect, no sign of optic nerve damage on exam or on imaging studies previously performed.
Plan: ... I reassured patient that his retinal examination appears normal and I expect his vision to improve. . .Continue to observe. . .[follow up] in neuro clinic (Dr. Samy) in 2-3 weeks. . .

Exhibit B at 18. Dr. Samy saw Gibson on February 9, 2009, for that follow-up appointment. Exhibit B at 40-43. He noted, Exhibit B at 42-43:

-I don't see any sign of traumatic optic neuropathy and he has healthy optic nerve and retina in his left eye
-sectoral injection inferiorly consistent with episcleritis vs. Scleritis: for pred forte eye drops qid OS for one week, Ibuprofen 600 mg tab TID for one week, zantac 150 tab for one week
-The CT scan didn't show any optic canal fracture or any orbital pathology, will order MRI orbit with fat suppression to [rule] out any retrobulbar cause for his comp[laint]
Would like to review the MRI and CT images after being done at A[ltoona].
-his subjective complaint today of visual acuity no light perception with his left eye isn't supported by the clinical exam without APD and with 20/60 Vision in his left eye as tested by the vectograph
-Retina exam done By Dr. Gallagher (retina specialist done 1/22/09) confirmed the normal exam of the retina without organic cause to explain the visual loss in the left eye

A PrimeCare note with an unknown physician's signature, perhaps a Dr. Hoffman, reflects awareness of the diagnosis of episcleritis and the prescriptions ordered by Dr. Samy. Exhibit B at 45.

11

Medication records indicate that the prescriptions were administered. Exhibit B at 48.

The next follow-up appointment with Dr. Capriotti took place on February 18, 2009; one with Dr. Samy was scheduled for March 4, 2009. Dr. Capriotti's notes, Exhibit B at 39, indicate that he doubted the reliability of Gibson's complaints that he had no vision in his left eye, that he would follow Dr. Samy's orders, and that Gibson should return for an appointment in six weeks. Gibson was transferred from the Blair County Prison on March 5, 2009. Because there are no records of a March 4, 2009 appointment, I conclude that Dr. Samy did not see Gibson on that date.

Prior to the appointment scheduled with Dr. Samy, Gibson had an MRI scheduled for February 20, 2009. The records note that Gibson refused it "because he didn't want to miss his visit", Exhibit B at 55-56. The MRI was rescheduled for February 24, 2009. The February 24, 2009 MRI, as interpreted by Dr. Emmanuel Osagiede, indicated "degenerative change with atrophy" in the left optic nerve. Exhibit A at 29. Dr. Osagiede made no treatment recommendations.

There is no evidence that anyone employed at the prison or by PrimeCare, particularly the individual defendants named in the complaint, failed at any point to treat Gibson, to refer Gibson to an outside specialist, or to follow the course of treatment prescribed by the outside specialists.

Gibson received extensive follow-up care from three ophthalmologists and auxiliary outside specialists in the little more than two months between the assault in late December 2008 and his transfer in early March 2009. In February 2009, Dr. Samy diagnosed Gibson with episcleritis, for which he prescribed a week of prednisone forte eye drops. The personnel at the prison carried this out. Gibson's allegations that personnel at the Blair County Prison deliberately or negligently denied him proper care for the episcleritis or the assault are not supported by the record. To say that there was any shortcoming in the treatment provided by defendants Nurse Lisa and Nurse Melissa, or that there was some medical care defendants Johnson and Mazuky knew Gibson needed and improperly refused to provide, is not even suggested by this record. The record also lacks any evidence to show that the hypothesized lapses by these defendants did or could have caused plaintiff the injury he regrettably suffered. Summary judgment should be entered in favor of all defendants.

Pursuant to 28 U.S.C.§ 636(b)(1), the parties are given notice that they have fourteen days to serve and file written objections to this Report and Recommendation.

DATE: August 31, 2012

/s/ Keith A. Pesto
Keith A. Pesto,
United States Magistrate Judge

Notice to counsel of record by ECF and by U.S. Mail to:

    William Gibson HY-1800
    S.C.I. Rockview
    P.O. Box A
    Bellefonte, PA 16823-0820